# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**G. MITCHELL DAVIS,**

    **Plaintiff,**

v.                                                      **Case No. 8:12-cv-60-T-30MAP**

**TAMPA BAY ARENA, LTD.,**
d/b/a St. Pete Times Forum,

    **Defendant.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant's Motion for Partial Summary Judgment (Dkt. 86) and Plaintiff's Response in Opposition (Dkt. 97). The Court, having considered the motion, response, record evidence, and being otherwise advised in the premises, concludes that the motion should be granted in part and denied in part.

## BACKGROUND

This action seeks damages and injunctive relief for copyright infringement and related state law claims. Plaintiff G. Mitchell Davis is a professional photographer. Defendant Tampa Bay Arena, Ltd d/b/a Tampa Bay Times Forum (the "Forum")[1] is in the business of hosting and serving as an entertainment venue for various concerts, sports, shows, and other events in the Tampa Bay area.

---

[1] The Forum is the successor in interest to the facility f/k/a the Ice Palace Arena. For the purposes of this Order, the Court will refer to both entities as the Forum, since any distinction between them is irrelevant at this point.

In 1996, Davis first performed photographic services for the Forum pursuant to a verbal agreement. When Sean Flynn became the Marketing Director in 1998, the Forum continued to engage Davis verbally to produce photographs on an event-by-event basis. From 1998 until some time in 2000, Davis photographed all of the Forum's events on film. During the film era, after photographing an event, Davis would send the film to a third-party vendor to process the film and create photographic transparencies (slides). Davis would then review the images embodied in the transparencies, remove any inferior shots, order prints of the best images to include in his personal portfolio, and then deliver the transparencies along with an invoice to the Forum for his fee and all expenses for film and processing costs.

In 2000, Davis typed the terms of a written agreement that he negotiated with Flynn regarding the "terms and conditions" under which Davis "accepts and will complete the assignment to produce photographs of events for the [Forum]." (Dkt. 86-1). Under the agreement, Davis was entitled to $150 per event for his photographic services, and an hourly rate of $20 for events lasting more than four hours. *Id.* The agreement provided the Forum with limited use of Davis' photographs, including the "rights to reproduce images for newsletter, advertising, display prints, broadcast, and the [Forum] web site." *Id.* The agreement also provided, with respect to "Ownership of Images", that: "The [Forum] agrees that the ownership and copyright remains that of [Davis]. All images are copyrighted by [Davis] and will remain so. Photo credit will be given when applicable." *Id.* Under "Reproduction Rights", the agreement also provided that: "The [Forum] agrees to allow [Davis] the right to use images from their events for use in his portfolio, web site and for

composites. These images are to be used as a sample of his work only. [Davis] agrees that all images photographed at the [Forum] are not for sale without their permission." *Id.*

Around the same time that the written agreement was executed, Davis began to use both a film camera and a digital camera to photograph events. From March 24, 2003, until the termination of the parties' relationship, Davis used only a digital camera to photograph the Forum's events. Davis possesses all digital images on backup CDs he created and kept.

In February 2007, the parties executed a second agreement, almost identical to the initial written agreement.[2] The only substantive changes increased Davis' fee to $350.00 per event, increased Davis' hourly rate to $130.00 per hour, and amended "Reproduction Restriction" to delete the requirement that the Forum obtain Davis' permission before using the images in "[p]osters for sell." (Dkt. 86-2).

At some point in 2009, or 2010, the Forum created a Facebook page and began to post Davis' pictures of its events on the Facebook page.[3] The Forum uses their Facebook page for advertising. The record reflects that Davis initially objected to the Forum posting his pictures on the Forum's Facebook page. Davis did not like the Forum using his pictures on its Facebook page and viewed the usage as a violation of his agreement. According to Davis, he conditioned the Forum's use of his pictures on its Facebook page as follows: (1) the Forum could upload only low-resolution photographs; (2) the Forum had to properly credit Davis for each of his photographs; (3) the Forum had to preserve metadata showing Davis'

---

[2] Davis negotiated the second agreement with Flynn's successor, Holly Brown.

[3] Facebook is a social networking site that connects people with friends.

ownership information of the images; and (4) the Forum had to protect Davis' photographs from third parties (i.e., so that they could not make unauthorized copies of his work).

The record reflects that in September 2010, Davis began to assist the Forum in posting low resolution digital versions of Davis' images to the Forum's Facebook page. Specifically, Davis created a password protected web portal access to his photo-server, which Davis referred to as the "Ice Box". Davis established logons and passwords that granted certain marketing staff[4] of the Forum permission to upload Davis' images to Facebook in a small version without first having to manually resize them.

The record reflects that from September 2010 until approximately March 2011, Davis uploaded event photos on the Ice Box for the Forum's Facebook posts. An e-mail dated September 16, 2010, from Davis to Eckley, Babooram, and Straub stated: "Jessica, Please make sure that the intern gives me photo credit this time please." (Dkt. 86-5). That same day, Eckley replied to all and stated: "I will. She definitely does on all of our Facebook posts." *Id.* In an e-mail dated September 19, 2010, from Davis to Eckley, Davis stated: "Please bookmark this website. *From now on you will download the images from events for your Facebook account from here.*" (Dkt. 86-3) (emphasis added). On October 9, 2010, Davis sent an e-mail to Babooram and Eckley, with the subject "Facebook photos STP" that stated, in relevant part: "OK Ladies, *I just uploaded the photos for your facebook post from last night:*" (Dkt. 86-4) (emphasis added). There are similar e-mails from Davis to the

---

[4] Davis communicated with a number of the Forum's marketing staff during the time that he assisted them with posting his images on the Forum's Facebook page: Jessica Eckley, Nashira Babooram, Elmer Straub, and Brittany Zion.

Forum's marketing staff dated October 25, 2010, November 17, 2010, November 27, 2010, December 6, 2010, December 13, 2010, December 20, 2010, January 6, 2011, January 23, 2011, January 30, 2011, February 21, 2011, February 28, 2011, and March 6, 2011, in which Davis indicated that he had uploaded or refilled event photos on the Ice Box. *See* (Dkt. 86-4). Davis does not state in any of these e-mails any limitations on the Forum's use of the uploaded event photos on the Forum's Facebook page. *See id.*

The record reflects that Davis notified the Forum's marketing staff when they failed to use low resolution images from The Icebox for the Forum's Facebook posts. For example, on January 23, 2011, Davis sent an e-mail to Zion and Eckley, which stated:

> Hey Girls,
> Please be aware that your new intern has uploaded the full size high res versions of the Circus and the Winter Jam photos. He also left it so you can DOWNLOAD the full resolution print quality images.
> If you give him the DVD and he does not know how to resize the images in photoshop this will happen again. That [sic] one of the reasons that I put the Ice Box page together. You can choose what size image you need and it will do the sizing for you.
> Please correct this problem,

(Dkt. 86-6).

The next day, Eckley sent an e-mail, explaining that the reason high res versions from the DVD were posted was because Davis had forgotten to upload the low res images to the Ice Box, which prompted Davis to explain that the purpose for establishing the Ice Box was to facilitate posting low res images to the Forum's Facebook page. The following reflects portions from their January 24, 2011 e-mails:

> Eckley 4:38 pm: Pedro cannot resize images from the CD so we will need you to upload low res versions to the Ice Box for us to switch

>them out . . . Let us know when Winter Jam is up and we will grab them.
>
>Davis 7:09 pm: I'm a little confused because nothing has changed with the Ice Box. It's been in place since last year's Storm season. I don't need to upload low res versions of the images, you just need to choose to download the SMALL version of the image. This is just like when Nashira was downloading the high res version for Pollstar or Venue Today and you were downloading the small version for Facebook. Nothing has changed. If I need to I will be more than glad to come down and go over the procedure with everyone . . .
>
>Eckley 7:49 pm: Not that I need to explain, but our UNPAID intern, after working 40 hours this week plus two events took it on himself to go home and upload photos because you were concerned it wasn't done yet . . . Pedro's email below was simply pointing out that there was no pictures from Winter Jam in Ice Box.
>
>Davis 9:48 pm: As I said I would be happy to come in and instruct you guys on how the download process works. In you[r] first email you asked me to re-upload low res versions . . . . *The reason I put together the Ice Box was to make things easier for everyone. You don't even have to contact me to download an image or if you need low res vs high res. You simply choose which size image and download it.*

(Dkt. 86-7) (emphasis added).

At his deposition, Davis admitted he was not telling the Forum in these e-mails that it was prohibited from posting low-resolution images on Facebook, but was instead telling the Forum how to post low-resolution images on Facebook using the Ice Box. Davis also testified that he constantly told Eckley *verbally* that the Forum's use of his images on Facebook was a violation of his agreement.

According to Davis, on or about February 2011, he complained to Eckley and Straub about the use of his images on the Forum's Facebook page. Around this time, Davis discovered that third parties could download his images from Facebook and considered this

a violation of his agreement. Davis testified at his deposition that when he told Straub that he did not want his images posted on the Forum's Facebook page, Straub responded that the Forum needed to be able to post his images to Facebook for advertising. Davis interpreted Straub's response to mean that if Davis prohibited the Forum from posting his images to Facebook, Davis would lose his role as the Forum's photographer. Davis testified: "I was either to quit my job or to let them keep downloading the photos to Facebook. I had no other choice. So Elmer kept stringing me along by saying, we're going to work on it. We're going to work on it. We're going to work on it." (Deposition of Davis at 250:10-14). During his deposition, Davis also testified: "The only reason I ever put up with them using any pictures on Facebook was because they were lying to me [about changing the photography agreement]". *Id.* at 258:15-21. Davis stated that the Forum was going to include "some type of bonus for allowing them to use [his] photos for Facebook." *Id.* at 258:22-23.

Nothing in the record suggests that Davis ever told the Forum during any point in their relationship that he considered the use of his images on Facebook to be *copyright infringement*. According to Davis, he allowed the Forum to continue to post his images on Facebook because Straub told him that he would provide Davis with a new contract fairly compensating Davis for the Facebook usage.

On February 24, 2011, Straub sent an e-mail to Davis stating, in relevant part: "I have asked Paul D [the Forum's attorney] to draw up an agreement that is current so we are operating from something that originated w/ us (you, me, jessica and brittany), not any former marketing folks because ultimately we are the ones working together." (Dkt. 86-9).

The record reflects that, during this time, Davis continued to e-mail the Forum's marketing staff when he uploaded new event photos to the Ice Box.

On March 9, 2011, Straub sent Davis a draft of the new agreement by e-mail. (Dkt. 86-11). On April 15, 2011, Straub e-mailed Davis indicating that there was a "tweak" to the draft contract. (Dkt. 86-12). When Davis responded to ask what the "tweak" was, Straub replied: "Giving you the right to be able to do your portfolio and even sell pics while allowing us to post o[n] Facebook, website, etc and promote our events day to day, etc, etc". *Id.*

The parties were unable to agree on the terms of a new agreement. According to Davis, the new agreement drastically changed the terms of his previous agreements with the Forum. Subsequently, on June 16, 2011, Straub met with Davis and informed him that the Forum would no longer be using him to photograph its events.

On July 15, 2011, Davis' attorney sent a letter to the Forum. The letter stated, in pertinent part, that the Forum was "*in breach of the terms of the agreement* signed by [Davis] and the Forum . . . as well as predecessor agreements." The letter also stated, in pertinent part, that Davis was the "lawful owner of all of the images taken over the entire course of his work for the Forum" and stated that Davis "would like to make arrangements to obtain possession of all hard copy original images, including negatives, which are in the possession, custody, or control of the Forum." The letter also stated, in part: "If the Forum wishes to make use of such originals or negatives pursuant to the Agreement, [Davis] will agree to coordinate with the Forum to facilitate such use." (Dkt. 55-4) (emphasis added).

Davis estimates that he delivered between 23,000 and 33,000 slides to the Forum. (Dkt. 97-1). According to Davis, the Forum returned approximately 200 slides to him. According to Davis, the Forum told him that the slides returned to Davis were the only slides that the Forum was able to locate.

Davis testified during his deposition that he is operating under his photography agreements with the Forum "[u]ntil this court case is over". (Deposition of Davis at 407:7-9).

Davis' amended complaint against the Forum alleges claims for: copyright infringement (Count I); breach of bailment (Count II); conversion (Count III); replevin (Count IV); and breach of contract (Count V). The Forum moves for summary judgment on Davis' copyright infringement claim (Count I), and Davis' property claims (Counts II-IV). For the reasons stated below, the Court grants the Forum's motion with respect to the copyright claim and denies the Forum's motion with respect to the property claims.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248

(1986) (emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  *Id.*  Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor.  *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *Celotex,* 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  *Anderson,* 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.,* 906 F.2d 559, 564 (11th Cir. 1990).  "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir. 1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson,* 477 U.S. at 248; *Hoffman v. Allied Corp.,* 912 F.2d 1379 (11th Cir. 1990).  However, there must exist a conflict in substantial evidence to pose a jury question.  *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

**DISCUSSION**

I. **Davis' Copyright Infringement Claim**

The Forum argues, in part, that it is entitled to summary judgment on Davis' copyright claim because Davis granted the Forum an implied license to post his images to the Forum's Facebook page. The Court agrees that, taking the record in a light most favorable to Davis, the non-movant, it is undisputed that Davis granted the Forum an implied license to post his images to the Forum's Facebook page.

Although the Copyright Act provides that the transfer of an exclusive license to a work must be in writing, the statute exempts nonexclusive licenses from the writing requirement. *See* 17 U.S.C. § 204; 17 U.S.C. § 101 (defining transfer of copyright ownership to exclude a nonexclusive license). Thus, a nonexclusive license to use a copyrighted work "may be granted orally, or may even be implied from conduct." *Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749, 752 (11th Cir. 1997) (internal quotations omitted).

An implied license is created when: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee copy and distribute his work." *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1281 (M.D. Fla. 2008) (quoting *Nelson–Salabes, Inc. v. Morningside Dev., LLC,* 284 F.3d 505, 514 (4th Cir. 2002); *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558-59 (9th Cir. 1990)).

As explained by the Eleventh Circuit in *Wilchombe v. TeeVee Toons, Inc.*

> A nonexclusive license to use copyrighted material may be granted orally or implied from conduct . . . An implied nonexclusive license is

>created when one party creates a work at another party's request and hands it over, intending that the other party copy and distribute it . . . In determining whether an implied license exists, a court should look at objective factors evincing the party's intent, including deposition testimony and whether the copyrighted material was delivered "without warning that its further use would constitute copyright infringement."

555 F.3d 949, 956 (11th Cir. 2009); *see also Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010). "[A]n implied license will be limited to a specific use only if that limitation is expressly conveyed when the work is delivered." *Latimer*, 601 F.3d at 1235.

The record is undisputed that Davis granted the Forum an implied license to post his images to the Forum's Facebook page. The agreements demonstrate that the Forum requested Davis to "produce photographs" of its events. As requested, Davis took the photographs and delivered them to the Forum by establishing logons and passwords for the Forum's marketing staff to access the Ice Box photo-server. Davis also instructed the Forum's marketing staff to download the images to Facebook through the hyperlink to the Ice Box. Davis then sent e-mails to the Forum after he uploaded the images to the Ice Box in order to notify the Forum's marketing staff when the images were ready to be posted to Facebook. Additionally, Davis never told anyone at the Forum that he would file suit for copyright infringement if the images were not removed from Facebook. Moreover, Davis continued uploading the images to the Ice Box after Facebook added a feature that made it possible for visitors to the Facebook page to make unauthorized copies of images posted on Facebook.

In his response, Davis argues that there are genuine disputes regarding the scope of any implied license that may have been created. Davis argues that he objected to the

Forum's use of his images on Facebook and attached a number of conditions to the Forum's use of his images on Facebook. Davis argues that "[t]here is a genuine issue of material fact regarding the scope of any implied license that may have been created and to what extent the Forum complied with that scope." (Dkt. 97).

Davis' response misses the salient issue. Davis neglects to acknowledge that his copyright infringement claim fails even if the Court assumes that Davis attached conditions to the scope of the implied license and assumes that the Forum failed to comply with those conditions. In other words, the Court interprets any disputed facts on these issues in Davis' favor, as the Court must do. However, any disputes on these issues are not material because, even assuming that Davis attached conditions to the Forum's use of his images on Facebook, the record is clear that these conditions were covenants, not condition precedents to the granting of the implied license. Accordingly, any breach on the Forum's part of these covenants provides Davis with a breach of contract claim against the Forum, not a copyright infringement claim.

Importantly, copyright law is clear that a licensee's breach of a covenant in a copyright license does not rescind the authorization to use the copyright work, but rather provides the *licensor* with a cause of action for a breach of contract. *See Graham v. James,* 144 F.3d 229, 236-37 (2d Cir. 1998); *Atlantis Info. Tech. v. CA, Inc.,* 485 F. Supp. 2d 224, 233-34 (E.D.N.Y. 2007); *see also Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749, 753-54 (11th Cir. 1997) (breach of a covenant in a copyright license does no more than provide licensor an opportunity to seek rescission of the license, but does not constitute an *ab initio* rescission

of the licensee's permission to use a copyrighted work); *Edgenet, Inc. v. Home Depot U.S.A., Inc.,* 2010 WL 148389, at *6 (E.D.Wis. Jan. 12, 2010) (quoting and relying on *Graham* ); *RT Computer Graphics, Inc. v. U.S.,* 44 Fed.Cl. 747, 756-57 (Fed.Cl.1999) (same).

The Second Circuit held in *Graham* that, if a defendant's conduct "'constitutes a breach of a covenant undertaken [by the defendant] and if such covenant constitutes an enforceable contractual obligation'" in the defendant's license agreement with the copyright holder, then the copyright holder will have "'a cause of action for breach of contract,' not copyright infringement." 144 F.3d at 236 (quoting *Nimmer* § 10.15[A], at 10–120); *see also Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.,* 387 F. Supp. 2d 521, 534 (M.D.N.C. 2005) (holding that a licensee's use of a copyright work in excess of that which was authorized under the license was a breach of a covenant under the terms of the license agreement between the parties, and therefore the copyright holder was only entitled to breach of contract damages, and not copyright remedies).

"Generally, provisions in a contract are presumed to be covenants rather than conditions precedent because the alternative often results in a forfeiture against one party or another." *Russian Entertainment Wholesale, Inc. v. Close-Up Intern., Inc.* 767 F. Supp. 2d 392, 408-09 (E.D.N.Y. 2011). In *Jacob Maxwell*, the Eleventh Circuit affirmed the district court's granting of the defendant's motion for summary judgment of non-infringement, holding that the defendant had a nonexclusive license to play a song. *See generally* 110 F.3d 749. Specifically, a songwriter named James Albion agreed to write a team song for the Miracle, a minor league baseball team. *See id.* at 751. "Albion agreed to write the song free

of charge, to provide the Miracle with the Digital Audio Tape master, and to grant the Miracle an exclusive license." *Id.* In return, Miracle had to pay his out-of-pocket production costs and give him credit as the author any time the song was played at games or distributed on cassette tapes. *See id.* Albion delivered the song to the Miracle, and the team proceeded to play it at many games during the course of a summer. *See id.* Albion, however, was never given the promised authorship credit, and he sued the team, alleging copyright infringement and breach of contract. *See id.*

On appeal, the Eleventh Circuit noted that the payment of Albion's costs and public recognition of his authorship of the song were not made conditions precedent to the team's right to play the song. *See id.* at 753. The Eleventh Circuit stated that the songwriter had "expressly granted the Miracle permission to play the song before payment was tendered or recognition received." *See id.* at 754. "Implicit in that permission was a promise not to sue for copyright infringement." *Id.* at 753. The Eleventh Circuit noted: "Albion did not withdraw permission although he attended many games and heard the song played, still without payment or recognition, on various occasions. Indeed, he ... encourag[ed] the Miracle to continue to play the song. Under these circumstances, we cannot say that [Albion's] permission to play was conditioned on prior payment and public recognition." *Id.* at 754.

In this case, the record is clear that despite the conditions Davis may have placed on the Forum's use of his images on its Facebook page, Davis did not withdraw his permission to allow the Forum to use his images on Facebook even after Davis was placed on notice

numerous times during the parties' relationship that the Forum was not complying with the conditions. Indeed, the record is undisputed that, as late as March 2011, which was *after* Davis told Straub and Eckley that he did not want them using his images on Facebook, Davis continued to e-mail the Forum's marketing staff when he uploaded new images on the Ice Box for their use on the Forum's Facebook page. Davis' testimony that he was waiting for a new agreement during this time further demonstrates that the conditions were covenants, not conditions precedent, and that, any breach of these covenants, amounted to a breach of the implied license, not copyright infringement. Notably, Davis testified that Straub led him to believe that the parties would negotiate a new agreement that compensated him for the use of his images on Facebook.

According to Davis, he frequently informed the Forum that it was in violation of the existing agreement. Again, this demonstrates that the Forum's failure to abide by the terms of the implied license constituted a breach of contract, not copyright infringement. It is also notable that Davis did not attempt to rescind the implied license. In sum, Davis' conduct in this case demonstrates an implicit promise not to sue the Forum for copyright infringement. Therefore, the appropriate remedy for any breach of the covenants is a breach of contract action (which Davis has pled in Count V of his amended complaint), not a copyright infringement action.

Accordingly, the Forum is entitled to summary judgment on Davis' copyright infringement claim.

## II. Davis' Breach of Bailment, Conversion, and Replevin Claims

The Forum raises a number of arguments in its attempt to defeat Davis' breach of bailment, conversion, and replevin claims. The Court concludes that the record is rife with disputed facts on these issues. As an initial matter, it is unclear whether the Forum still possesses Davis' property. Assuming it does, however, there are disputed facts regarding who owns the slides and who has a right to possession of the slides. With respect to "Ownership of Images", the agreements state that: "The [Forum] agrees that the ownership and copyright remains that of [Davis]." (Dkt. 86-1, Dkt. 86-2). The record reflects that it was Davis' understanding that he owned the slides and was simply lending them to the Forum for its convenience in exercising its limited use rights. Davis' understanding is supported by Brown's testimony that, had she been asked, she would have returned the slides to Davis because they were his property. Babooram's testimony also lends support to Davis' claim that he was entitled to the slides.

With respect to bailment, the record is disputed whether a bailment contract exists here. There is evidence to suggest that an implied bailment contract was created when Davis provided the slides to the Forum for a particular purpose and that the purpose has now been fulfilled.

The Court also disagrees with the Forum's argument that Davis has not sufficiently identified the property. The record reflects that Davis delivered between 23,000 and 33,000 slides to the Forum. The record reflects that various members of the Forum's marketing staff remembered the slides, what they looked like, and where they were stored. There is also

nothing in the record to suggest that the Forum has any other transparencies in its possession that might be confused with Davis' property; notably, the Forum was able to identify and locate approximately 200 of Davis' slides.

In sum, Davis' claims of breach of bailment, conversion, and replevin must be determined by the finder of fact. Accordingly, the Forum's motion for summary judgment with respect to these claims is denied.

### III.     Supplemental Jurisdiction

Davis originally filed this action in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, Case Number 11-15399 (K). On January 11, 2012, the Forum removed the state-court action to this Court because Davis' complaint essentially pled a federal copyright claim (Dkt. 1). Thus, the basis for removal was federal jurisdiction. The Court has now awarded judgment in the Forum's favor on the sole federal claim, i.e, the copyright claim. Pursuant to 28 U.S.C. § 1367(c), the Court has discretion to decline to exercise supplemental jurisdiction over the state-law claims once the federal claims are dismissed. In this case, Davis' state-law claims of breach of bailment, conversion, replevin, and breach of contract, depend on interpretations of state law. The Court concludes that judicial economy, fairness, convenience, and comity compel the Court to decline jurisdiction over the state-law claims because these claims are best resolved by the state court. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) (dismissal of state law claims strongly encouraged when federal law claims are dismissed prior to trial).

Accordingly, Davis' state-law claims shall be remanded to state court, rather than dismissed, because this case was originally filed in state court and removed to federal court. *See Lewis v. City of St. Petersburg, Fla.,* 260 F.3d 1260, 1267 (11th Cir. 2001).

It is therefore **ORDERED AND ADJUDGED** that, for the reasons stated herein:

1. Defendant's Motion for Partial Summary Judgment (Dkt. 86) is granted in part and denied in part. The motion is granted to the extent that the Court grants summary judgment in Defendant's favor on Plaintiff's copyright infringement claim (Count I of Plaintiff's amended complaint). The motion is denied with respect to Plaintiff's breach of bailment, conversion, and replevin claims.

2. The Clerk of Court is directed to enter final judgment in Defendant's favor and against Plaintiff solely on Plaintiff's copyright infringement claim (Count I of Plaintiff's amended complaint).

3. After entering final judgment as stated in paragraph 2. herein, the Clerk of Court is directed to remand this case to the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, and provide that court with a copy of this Order.

4. The Clerk of Court is directed to close this case and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida on June 27, 2013.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record
S:\Even\2012\12-cv-60.MSJ.frm